# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued September 14, 2005       Decided October 14, 2005

No. 04-1250

THE INDUSTRIALS, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NORTHERN NATURAL GAS COMPANY AND
SEMCO ENERGY GAS COMPANY,
INTERVENORS

————

Consolidated with
04-1253, 04-1257

————

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

————

*Thomas C. Gorak* argued the cause for petitioners. With him on the briefs were *Paul F. Forshay*, *Kirstin E. Gibbs*, *Katherine B. Edwards*, and *John Paul Floom*. *Frederick T. Kolb* entered an appearance.

*Beth G. Pacella*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

*Frank X. Kelly*, *Steve Stojic*, *J. Gregory Porter*, and *Maria K. Pavlou* were on the brief for intervenor Northern Natural Gas Company in support of respondent.

Before: SENTELLE and RANDOLPH, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Concurring opinion filed by *Circuit Judge* SENTELLE.

WILLIAMS, *Senior Circuit Judge*: Firms that ship gas on pipelines sometimes take more—or less—gas out of the pipeline at the end of the shipment than they had delivered upstream. Periodically (usually monthly), the resulting imbalances are adjusted by a "cash-out." But the cash-out price may create perverse incentives. Specifically it may create an incentive to "game" the system, deliberately taking more or less gas when it appears likely that the ultimate cash-out price will be such as to make deviations profitable. For example, if the cash-out price is set at the average monthly price (as was true for the pipeline involved in this case, Northern Natural, before the orders at issue here),[1] and prices

---

[1] Northern's cash-out mechanism also contained a tiered component for imbalances exceeding 3% which is not at issue here. This component provided that for such excesses the price would be multiplied by a specified factor. If net imbalance was below 3% of the schedule amount, the price multiplier would be 1.

have been rising for the month's first 25 days, there is a considerable likelihood that the end-of-the-month price will be above the monthly average. Shippers may respond by deliberately taking extra gas from the system, reselling it in the spot market, and paying for it in the cash-out at the lower (monthly average) rate. Northern's system took account of the problem to some degree by calculating the average monthly price on a 10-day lag (from the 11th day of the month to the 10th day thereafter), Joint Appendix ("J.A.") 73, 83, but even this left some incentive for arbitrage at the very end of the month.

Where such temptations to arbitrage exist, the pipeline's net imbalances are naturally likely to rise. Although the pipeline can recover the net expense in its rates, individual shippers will not bear the resulting cost in the proportion that their conduct caused the expense. In an extreme case, the imbalances could make it hard for the pipeline to manage its load.

In 2003 Northern filed a proposal under § 4 of the Natural Gas Act, 15 U.S.C. § 717c, to change its cash-out mechanism so as to eliminate this arbitrage opportunity. Under the proposal a shipper that took more gas than it delivered in the course of a month would pay Northern for the net excess at the highest of the five weekly average prices applying to that month. If a shipper took out less than it delivered, Northern would pay the shipper at the lowest of the five weekly averages.

In two orders the Federal Energy Regulatory Commission approved a slightly modified version of Northern's proposal. *Northern Natural Gas Co.*, 105 FERC ¶ 61,172 (2003), *order on reh'g,* 107 FERC ¶ 61,252 (2004). Various consumers of gas that is delivered on Northern, buyers of Northern's

4

transportation services, and producers of natural gas petition here for review. They attack the orders as inconsistent with the principles the Commission had developed in Order No. 637, *Regulation of Short-Term Natural Gas Transportation Services, and Regulation of Interstate Natural Gas Transportation Services*, FERC Stats. & Regs. [Regs. Preambles 1996-2000] (CCH) ¶ 31,091 (2000) ("Order No. 637"), *order on reh'g*, Order No. 637-A, FERC Stats. & Regs., [Regs. Preambles 1996-2000] (CCH) ¶ 31,099 (2000) ("Order No. 637-A"), *order on reh'g*, Order No. 637-B, 92 FERC ¶ 61,062 (2000), particularly claiming that Order No. 637 requires that any "penalties" be justified by a need to protect system reliability. They also assert deviation from later Commission decisions purporting to apply Order No. 637. Because of these claimed deficiencies the orders are said to be arbitrary and capricious. See 5 U.S.C. § 706(2)(A). Further, petitioners claim that the Commission lacked substantial evidence. 15 U.S.C. § 717r(b). We deny the petitions.

* * *

In Order No. 637 the Commission adopted what is now codified as 18 C.F.R. § 284.12(b)(2)(v), stating that a pipeline may include penalties in its tariff "only to the extent necessary to prevent the impairment of reliable service." But Order No. 637 also says that pipelines "may be able to change the methods by which they cash-out imbalances to eliminate the incentives for shippers to borrow gas from the pipeline because the cash-out price is less than the market price for gas." Order No. 637 at 31,314-15. This suggests at least that pipelines may adjust their cash-out mechanisms to "eliminate" arbitrage incentives without showing that the change is necessary to prevent the impairment of reliable service. And in Order No. 637-A the Commission said that

the existence of arbitrage "demands that pipelines revise the level and structure of their penalty provisions to minimize the opportunities for arbitrage." Order No. 637-A at 31,607. This language indicates that "penalty" is not a magic word that automatically triggers the system-reliability criterion. Rather, the Commission's point is that pipelines may properly seek to deter arbitrage. Yet, lest cash-out rules unduly limit shipper flexibility, pipelines' efforts against arbitrage should not go too far. As we shall see, petitioners have failed to show that the present orders deviated from those principles.

Commission decisions after Order No. 637 add some specificity as to when pipelines have gone too far in the effort to reduce arbitrage incentives. For example, the Commission has rejected mechanisms that provided cash-outs for imbalances measured over periods much shorter than a month. *ANR Pipeline Co.*, 103 FERC ¶ 61,252 (2003), *order on reh'g*, 105 FERC ¶ 61,236 (2003) (five days); *Williams Gas Pipelines Central, Inc.,* 100 FERC ¶ 61,232 (2002), *order on reh'g*, 102 FERC ¶ 61,119 (2003) (daily). The shorter the period of calculation, the more stringent the sanction is likely to be, as the shipper gets less benefit from the netting out of short-term positive and negative imbalances. As a result, the proposals went too far in reducing arbitrage incentives. And the Commission has similarly rejected systems that would have used as benchmarks the high/low of average prices from periods of less than one week, as in *Transcontinental Gas Pipe Line Corp*., 91 FERC ¶ 61,004 (2000).

No Commission decision has passed on a proposal identical to Northern's. But one comes close. In *Gulf South Pipeline Co.*, 97 FERC ¶ 61,069 (2001), *order on reh'g*, 98 FERC ¶ 61,068 (2002), the pipeline already used a mechanism similar to Northern's proposal here (imbalance calculation each month, using the high/low of weekly

averages). Gulf South proposed the addition of a fifth week in order to curtail the arbitrage incentive created by the mechanism's end-of-the-month days, during which the cash-out price could be known to a penny. In the presence of an obvious arbitrage incentive and evidence of substantial resulting imbalances, the Commission approved the change.

Much of the parties' discussion revolves around a set of orders relating to Texas Gas. *Texas Gas Transmission Corp.*, 95 FERC ¶ 61,093 (2001), *order after tech. conf.*, 96 FERC ¶ 61,318 (2001), *order on reh'g*, 97 FERC ¶ 61,349 (2001). There the Commission approved a proposal under which monthly imbalances under 2% of contracted capacity were not "cashed-out" but were settled in kind; imbalances exceeding 2% were cashed out at the high/low of five weekly averages. Explaining its order, the Commission expressed a happy-medium principle:

> Therefore, to the extent that Texas Gas' charges are necessary to remove the incentive for arbitrage, they are appropriate under Order No. 637. However, any change that is beyond what is necessary to remove a customer's incentive to game the pipeline's system and unnecessarily removes a customer's flexibility would be an inappropriate penalty.

*Texas Gas*, 96 FERC ¶ 61,318 at 62,218. Of course in the absence of a perfect mechanism, one that neither overdeters nor underdeters arbitrage, pipelines and the Commission can be expected to test the waters, gradually ratcheting up any scheme that generates substantial imbalances. (We note that no one here proposes a system of cashing out at the spot price at the moment the shipper takes more or less than its delivery. Perhaps technical difficulties stand in the way.) The Commission hasn't articulated exactly where the process must

stop, but its rejections in *ANR*, *Williams*, and *Transcontinental* make clear its readiness to impose limits.

The Commission in fact approved Texas Gas's proposal, explaining that for tightening a cash-out mechanism "a pipeline does not need to show that price arbitrage causes operational problems, particularly where the cashout mechanism provides the opportunity for price arbitrage and under-recovery of costs." *Texas Gas*, 96 FERC ¶ 61,318 at 62,218.

While *Texas Gas* is unclear on whether opportunities for price arbitrage are enough to justify a new cash-out mechanism absent actual under-recovery of costs, it is clear that the combination suffices; and the record here shows both. We have already described how Northern's former system would have provided an opportunity for price arbitrage. And the record contained substantial evidence of under-recovery by Northern under the prior regime, and even included admissions by parties filing comments in opposition to the proposed changes that imbalances were out of control, J.A. 501. Although petitioners' brief argues that some of the imbalance figures are in dollars and may reflect price changes, others are in quantities of gas and are not subject to that flaw. See testimony of Kent E. Miller, J.A. 88. Petitioners distinguish *Texas Gas* on the ground that there the first 2% of any shipper's imbalance were to be resolved in kind, but the distinction is not decisive, as the Texas Gas system subjected an out-of-balance shipper to the risk of having to buy the necessary differential at higher prices. Particularly in this period when the Commission is evidently experimenting with innovative mechanisms, the lack of identity between Northern's and Texas Gas's proposals is not very telling. The orders are thus supported by substantial

evidence, as well as consistent with the Commission's prior decisions.

Accordingly, the petitions for review are

*Denied*.

SENTELLE, *Circuit Judge*, *concurring*: I am in full concurrence with the majority's resolution of this petition. I write separately only to express my disagreement with the majority's conclusion that "*Texas Gas* is unclear on whether opportunities for price arbitrage are enough to justify a new cash-out mechanism absent actual under-recovery of costs." Maj. Op. at 7.

In *Texas Gas* the Commission stated:

> When price arbitrage occurs, the pipeline is, in essence, required to sell gas to its customers at below market levels and buy gas from them at above-market levels. As demonstrated by Texas Gas' situation, this can lead to the pipeline incurring a substantial underrecovery of costs. *There is no reason to make the correction of such a problem contingent on a showing that the imbalances are causing operational problems. It is not just and reasonable to require pipelines to underrecover their costs, and . . . the Commission did not require such a thing in Order No. 637*.

*Texas Gas*, 97 FERC at 62,634-35 (emphasis added); *see also Texas Gas*, 96 FERC at 62,218-19. It appears to me that the Commission by this reasoning made it clear that opportunities for price arbitrage are sufficient justification for a proposal to modify a pipeline's cash-out mechanism even in the absence of actual arbitrage.